# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
      **Plaintiff,**

    **v.**                              **Case No. 11-CR-253**

**SAINT GRIFFIN IV**
      **Defendant.**

---

## DECISION AND ORDER

The government charged defendant Saint Griffin with attempted possession of marijuana with intent to distribute and two counts of possessing firearms as a felon. Defendant filed a motion to suppress, arguing that the police violated his Fourth Amendment rights by unlawfully seizing him. During his subsequent detention defendant made statements and consented to the search of his car, cellular phones, storage locker, and residence (leading to the discovery of the contraband forming the basis for his indictment), which defendant sought to suppress as fruit of the unlawful seizure.

The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, at which the officer who seized defendant was the sole witness, then issued a recommendation that the motion be granted. The magistrate judge agreed that the police unlawfully seized defendant and concluded that all evidence subsequently obtained should be suppressed.

The government objected, requesting a de novo evidentiary hearing. See Fed. R. Crim. P. 59(b). The government argued that the magistrate judge improperly limited the testimony, hampering its ability to make an attenuation argument. See United States v. Johnson, 383

F.3d 538, 544 (7th Cir. 2004) (noting that evidence obtained as the result of an unlawful stop may be introduced into evidence at trial if sufficient attenuation exists to dissipate the initial taint of the unlawful police conduct).   After conducting two status conferences on the matter, I directed the parties to confer and create a time-line concerning defendant's seizure and subsequent events.   The parties complied with my order and, finding no material factual disputes, I declined to hold another hearing on attenuation.  (R. 41.)  I gave the parties time to file supplemental briefs on attenuation, which they have now done; the entire matter is ready for decision.  My review is de novo.  Fed. R. Crim. P. 59(b)(3).

## I.  FACTS AND BACKGROUND

### A.     Hearing Testimony

This case arises out of the controlled delivery of a suspicious package by United States postal inspectors, assisted by Detective Eugene Nagler of the Milwaukee HIDTA (High Intensity Drug Trafficking Area) task force.  (Jan. 6, 2012 Evid. Hr'g Tr. [R. 17] at 9-10.)  Inspector Daniel Kakonis had been investigating a series of packages mailed from a particular address in Sacramento, CA, a source area for controlled substances, to various locations in Milwaukee, including an address on N. 54th Street.  (Jan. 6, 2012 Hr'g Ex. 1 at 2-4.)  On August 2, 2011, Nagler and his drug-detecting canine assisted Kakonis in obtaining a search warrant for one of these packages, which was found to contain currency.  (Ex. 1 at 4; Tr. at 12, 44.)

On September 1, 2011, Kakonis again contacted Nagler regarding a suspicious package from the Sacramento address directed to the 54th Street location in Milwaukee.  (Tr. at 10.)  Nagler's dog alerted on the package, but the officers did not obtain a search warrant due to the press of time, as the package was scheduled to be delivered that morning.  (Tr. at 12-14.)  The

2

officers instead decided to attempt a delivery of the package to the 54th Street address. Accompanied by postal inspectors Haraway and Spellman, Kakonis and Nagler traveled to the 54th Street address, where Spellman made the delivery; Nagler was to provide cover and look for counter-surveillance. (Tr. at 15-16.) As Spellman approached the house, Nagler saw a vehicle approach and park on Chambers Street to the south of the target residence;[1] the driver, later identified as defendant, appeared to watch Spellman and Kakonis approach the house. (Tr. at 17-18, 41, 56.)

Nagler testified that in his experience the recipients of suspicious packages collect them in various ways: they may approach the carrier on foot; they may come out of the gangway; they may approach in vehicles; or they may be inside the target residence. He indicated that sometimes the listed address is a "drop house" where the package will be delivered and nothing will happen; the recipient may be sitting some distance away from the house doing counter-surveillance, looking for law enforcement. (Tr. at 18-19.)

Nagler testified that he decided to approach defendant's vehicle, even though he had no knowledge of any relationship between defendant and the package.[2] (Tr. at 19.) Nagler approached defendant's car and identified himself as a Milwaukee police detective. Defendant seemed surprised and dropped his hands from the steering wheel towards his lap, which, Nagler testified, caused him to become concerned about the presence of weapons, the

---

[1]The target residence sits on the northeast corner of Chambers and 54th Streets. (Tr. at 45, see also Ex. 2, 3, depicting the target residence looking east from Chambers.) Nagler testified that when he first saw defendant pull up he (Nagler) was parked on Chambers Street facing west; defendant parked on the southeast corner of the intersection. (Tr. at 49-52.)

[2]Nagler testified that he was present for five to ten minutes before defendant arrived (Tr. at 53), and that he watched defendant for a minute or two before approaching (Tr. at 54). Nagler was in plain clothes and driving an unmarked Ford Explorer. (Tr. at 51, 58.)

secreting of evidence, or that defendant would put the car in gear and driver off. However, Nagler testified that while defendant dropped his hands out of Nagler's sight, defendant did not lean forward as if he were reaching under the seat. (Tr. at 20, 59-60.) Nagler said something to the effect of "hey, get your hands up, put your hands up, let me see your hands." (Tr. at 20.) Defendant, who still seemed surprised or shocked, brought his hands back up to where Nagler could see them but then dropped them back down again. (Tr. at 21.) In response, Nagler pulled out his gun and commanded, "Get your hands up." (Tr. at 21.) Defendant put his hands up and then started to open the car door. As he got close to the car, Nagler saw a child in the back. Nagler told defendant, "you can't be doing that, putting your hands down," and directed defendant to step out of the car. (Tr. at 22.) Defendant complied. As he approached the car, Nagler testified that he saw two cell phones on defendant's lap. (Tr. at 73.) Nagler testified that, despite being concerned as defendant exited the car, he put his gun away after he saw the child. (Tr. at 63-64.)

Nagler admonished defendant about dropping his hands, stating "that's how people can get hurt because we don't know what you're doing. I don't know if you have . . . a gun, if you have weapons, you know, if you got dope or anything like that." (Tr. at 22.) Defendant replied that he had nothing like that, and that Nagler could look. (Tr. at 22.) As Nagler questioned defendant regarding why he was there, inspector Haraway approached, and defendant indicated that he was there to visit his aunt at the 54th Street address. (Tr. at 23, 68.) Nagler searched the car, while Haraway stayed with defendant,[3] discovering documents related to a storage locker and "Moneygram" receipts, some of which listed the 54th Street address. (Tr.

---

[3]The child remained in the car during the search.

at 24, 81-82.)

Nagler continued talking to defendant, trying to determine why he was there.  Defendant said something about meeting his cousin at the house to get a haircut for his son.  (Tr. at 25.) That made little sense to Nagler, so he tried to clarify, and defendant indicated that his son was not in school because of a problem with his Head Start Program.  (Tr. at 25-26, 68-69.)  While they were talking, defendant's cell phones – which had been placed on the roof or trunk of the car – were continuously ringing and alerting.  (Tr. at 26, 74.)  Nagler testified that based on defendant's strange stories and nervous demeanor, he believed defendant was being deceitful regarding the reason for his presence.  (Tr. at 26-27.)  Nagler told defendant he didn't believe him and remarked that his phones were "blowing up."  (Tr. at 29.)  Defendant responded, "there's nothing on the phones, you can look."  (Tr. at 29.)  Nagler looked at the phones, recovering text messages containing the name and address from the mailing label on the suspect package.  (Tr. at 31.)  At that point, defendant seemed to become more nervous and balled one of his hands into a fist, at which point Nagler handcuffed him.  (Tr. at 32.)  He left defendant in Haraway's custody and went to speak with Kakonis and Spellman (Tr. at 32), who advised him that they had delivered the parcel to a subject at the residence, who accepted it (Tr. at 82).  After making arrangements to secure the car and obtain care for the child, the officers took defendant downtown.  (Tr. at 32-33.)

Defendant later gave consent to search his storage locker, in which Nagler found United States postal boxes with mailing labels, a firearm, currency, and marijuana.  (Tr. at 35-36.) Nagler subsequently spoke with defendant at the HIDTA offices, where defendant had agreed to cooperate with Haraway and Kakonis.  (Tr. at 37-38.)  Defendant also agreed to allow Nagler

to download the contents of his cell phones.[4]  (Tr. at 40-41.)

## B.    The Magistrate Judge's Recommendation

The magistrate judge concluded that Nagler effected a seizure by ordering defendant to put his hands up, and that the seizure was unreasonable under the circumstances.  In opposing the motion before the magistrate judge, the government argued that Nagler lawfully seized defendant; it made no argument that defendant's later statements and consents were sufficiently attenuated from the seizure to be purged of the primary taint.  In a footnote, the government purported to reserve the right to address attenuation should the magistrate judge find the initial stop unlawful.  However, the magistrate judge concluded that if the government intended to make such arguments, "it is incumbent to do so at this juncture in the proceedings; a footnote stating that it seeks to reserve alternative arguments is merely an attempt by the government to have two bites at the apple."  (Recommendation [R. 23] at 10-11.)  The magistrate judge noted that defendant's motion sought the suppression of all statements and physical evidence as fruits of the unlawful arrest.  In the absence of any argument to the contrary, the magistrate judge concluded that defendant's statements and all physical evidence seized from defendant's car, person, and storage locker must be suppressed as fruits of the unlawful seizure.

## C.    Post-seizure Time-line

Despite its failure to properly raise the issue before the magistrate judge, I agreed to permit the government to make an attenuation argument.  However, in lieu of holding an additional hearing, I asked the parties to create a time-line of the events following defendant's

_____

[4]As indicated below, officers recovered a second firearm during a consent search of defendant's residence.

seizure.  That time-line follows (R. 38):

12:50: The package is delivered.

12:50-1:10: Defendant is seized and consents to the search of his car and phones.

1:10-1:20: Defendant is handcuffed and taken downtown for questioning.

2:10: Defendant is taken to an interview room, and officers remove the handcuffs.  He appears to sleep and walk around in the room before the officers arrive.

2:28: Officers enter the room.

2:29: Officers ask preliminary questions.  Officers tell defendant that they do not want to keep him long, and that he would be allowed to go home that day rather than being kept overnight.

2:32: Defendant is given the <u>Miranda</u> warnings.

2:34: Defendant waives his rights.

2:36-2:41: Defendant and the officers negotiate about cooperation and defendant wanting to leave that night.  They discuss the possibility that he won't be tried and the possibility of probation.  They also discuss which jurisdiction he may be charged in.

2:43: Defendant starts confessing about how the operation worked.

3:00: Officers seek consent to search the house.

3:31-3:34: Defendant gives consent to search the house.

3:35: Defendant gives officers the key to his house, and they use it to gain access, assuring him that this will not be a police raid.

3:36: Officers ask defendant about the storage locker.

3:37: Defendant gives consent to search the storage locker.

3:40: Defendant admits to having a gun in the storage locker.

3:56: Officers call and ask which key unlocks the storage locker.

4:15-:4:16: Officers search the house.

4:19: Officers leave the room to make a phone call to California.

4:26: Officers come in and ask which key opens the storage locker.

4:27: After failing to find the key, officers ask permission to pop the lock at the storage locker, which defendant grants.

4:34: Officers leave defendant in the interrogation room.

5:10: Officers go to the storage locker and find a gun, bullets, and money.

5:30: Defendant, left alone since 4:30, falls asleep. Officers wake him up and ask to open a package.

5:31: Defendant pleads to talk with his girlfriend.

5:32: Officers leave the room.

5:33: Officers come back in and let defendant talk to his girlfriend. They ask again to open the package, and he says yes.

5:34-5:35: Defendant talks to his girlfriend and asks about the child.

5:37: Officers leave the room.

6:16: Officers re-enter the room.

6:17: Officers attempt to work out cooperation between defendant and California.

6:47: Defendant makes a phone call.

6:50-6:52: They talk about the gun found in storage.

6:53-6:56: Defendant tells them where the gun in the house is (in a speaker). Defendant offers to bring the speaker out and let the officers grab it.

7:11: No further taped materials.

Officers accompany defendant to his house to retrieve the gun and bullets inside the speaker. Defendant is not taken back downtown for any further questioning after he helps the agents retrieve the weapon and ammunition from the stereo speaker inside his home.

## II.  DISCUSSION

**A.    The Initial Seizure**

   **1.    Applicable Legal Standards**

Not all encounters between the police and private citizens implicate the Fourth Amendment's ban on unreasonable searches and seizures.  United States v. Odum, 72 F.3d 1279, 1283 (7th Cir. 1995).  For instance, there is no Fourth Amendment impediment to an officer approaching a citizen on the street and putting questions to him; so long as the person is free to refuse and go about his business, the encounter remains consensual and no amount of suspicion is needed for the police to initiate it.  United States v. Yusuff, 96 F.3d 982, 985 (7th Cir. 1996).

However, if the officer commands the person to obey, there has been a seizure within the meaning of the Fourth Amendment.  See, e.g., United States v. Quinn, 83 F.3d 917, 921 (7th Cir. 1996).  The Fourth Amendment permits the police to temporarily stop and detain a person in order to dispel a reasonable suspicion that the person has or is about to commit a crime.  Terry v. Ohio, 392 U.S. 1, 10-11 (1968).  To justify a Terry stop, the officer must have specific and articulable facts, which, taken together with the rational inferences drawn from them, reasonably warrant the intrusion.  United States v. Rivers, 121 F.3d 1043, 1045 (7th Cir. 1997).  While reasonable suspicion requires something less than what is necessary to show probable cause, it requires more than a mere "hunch."  United States v. Ienco, 182 F.3d 517, 523 (7th Cir. 1999).  There must be some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.  Id.  The standard is an objective one, United States v. Barnett, 505 F.3d 637, 639 (7th Cir. 2007), based on the totality of the circumstances

known to the officer at the time he made the seizure, <u>Odum</u>, 72 F.3d at 1284. The court must give due regard to the officer's experience, knowledge, and expertise, <u>United States v. Sholola</u>, 124 F.3d 803, 812 (7th Cir. 1997), but a person's "mere propinquity" to others the officer suspects of criminal activity will not suffice, <u>see</u> <u>Ybarra v. Illinois</u>, 444 U.S. 85, 91 (1979). Nor may the court consider what the officers discovered after the stop. "Regardless of how compelling the later-learned facts may be, they are not part of the 'snapshot' presented to the officer at the time of the seizure. They are therefore irrelevant to the reasonable suspicion equation." <u>Odum</u>, 72 F.3d at 1284. The government bears the burden of demonstrating reasonable suspicion under <u>Terry</u>. <u>United States v. Longmire</u>, 761 F.2d 411, 417-18 (7th Cir. 1985).

### 2. Analysis

I agree with the magistrate judge that Nagler effected a seizure when, after identifying himself as an officer, he drew his weapon and ordered defendant to show his hands. <u>See</u> <u>Gentry v. Sevier</u>, 597 F.3d 838, 844 (7th Cir. 2010) ("When the officers pulled up in their patrol car and one officer exited the car and told Gentry to keep [his] hands up,' the officer executed a <u>Terry</u> stop."); <u>see also</u> <u>Carlson v. Bukovic</u>, 621 F.3d 610, 619 (7th Cir. 2010) (listing "the display of a weapon and the police officers' language and tone of voice suggesting compulsion" as relevant factors in determining whether a seizure occurred) (citing <u>United States v. Mendenhall</u>, 446 U.S. 544, 554-55 (1980)), <u>cert. denied</u>, 131 S. Ct. 1609 (2011). "The test for assessing whether a seizure has occurred is whether 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" <u>Gentry</u>, 597 F.3d at 844 (quoting <u>Michigan v. Chesternut</u>, 486 U.S. 567, 573 (1988)). A reasonable person in defendant's position, ordered by an armed police officer to show his

10

hands and exit his car, would not believe that he was free to disobey and leave the scene.  See

id. at 845 (citing Smith v. Kenny, 678 F. Supp. 2d 1093, 1123 (D.N.M. 2009) ("[O]rdering

residents to exit their home with their hands up under the color of authority constitutes a

seizure."); United States v. Brown, No. 03 CR 719, 2003 WL 23144858, at *3 (N.D. Ill. 2003)

(finding that a Terry stop occurred based on facts such as that the officer "ordered everyone

to put their hands up")); see also Verdier v. Borough, 796 F. Supp. 2d 606, 623 (E.D. Pa. 2011)

("[O]rdering Plaintiff to place his hands on the vehicle was a show of authority that would make

it clear to a reasonable person that he was not free to leave.").[5]

  I also agree with the magistrate judge that, at the time he effected this seizure, Nagler

lacked reasonable suspicion to believe that defendant had or was committing a crime.  Nagler

had no prior information connecting defendant to the residence or the package.[6]  Defendant

---

[5]Before the magistrate judge, the government essentially conceded that Nagler seized
defendant, instead arguing that the seizure was reasonable under the circumstances.  In its
objections to the Recommendation, the government attempts to distinguish Gentry, arguing
that the police intrusion in that case was much greater.  However, the pertinent holding from
Gentry is that the officers executed a seizure the moment they told the defendant to keep his
hands up.  597 F.3d at 844.  The court went on to hold that the officers lacked reasonable
suspicion to seize the defendant, discovering evidence of criminal activity only after the stop.
The same is true here: Nagler discovered evidence linking defendant to the package only after
the seizure.  That Nagler did not immediately conduct a pat-down (as did the officers in Gentry)
is irrelevant.  The government notes that Nagler holstered his gun after observing the child in
the car, but nothing in the record suggests that defendant was then free to leave.  Nagler
continued to question defendant and shortly thereafter placed him in handcuffs and took him
downtown.

[6]In its objections, the government catalogs the evidence postal inspectors gathered
regarding the mailing of suspicious packages to Milwaukee, including the 54th Street address.
The government complains that the magistrate gave this evidence scant attention.  But none
of that evidence pointed to defendant; Nagler had no idea who defendant was – and no
evidence linking him to these packages – prior to the seizure.  Thus, while this evidence
provides background on why the officers sought to deliver the package to this address, it
contributes little or nothing to the reasonable suspicion calculus.  See Ybarra, 444 U.S. at 90-
91 (holding that probable cause to search a bar did not provide a basis for seizing a previously

first drew Nagler's attention when he parked across the street from the target residence and appeared to watch the delivery of the package. However, defendant made no effort to approach the residence or the person delivering the package, and briefly watching a postal worker deliver a package to a neighborhood home does not suggest a connection between the watcher and the package.

Nagler testified that in his experience the recipients of suspicious packages collected them in various ways, including approaching the carrier on foot, coming out of the gangway, approaching in a vehicle, or occupying the target residence. Defendant did none of these things. Nagler testified that sometimes the address listed on the package is merely a "drop house," with the true recipient sitting some distance away performing counter-surveillance. But this cannot mean that the police are allowed to seize anyone who happens to park in the vicinity of a controlled delivery.[7] This is particularly true where, as here, the police observed

---

unknown person who happened to be present); <u>United States v. Wright</u>, No. 10-CR-340, 2012 WL 707085, at *5 (E.D.N.C. Mar. 3, 2012) (holding that the defendant's presence in a high crime area, in front of a residence where the officer had previously executed a search warrant, did not provide reasonable suspicion).

[7]The government argues that defendant's actions were consistent with Nagler's testimony as to how suspects typically retrieve mailed contraband from a drop house. But Nagler's testimony in this regard was so expansive as to permit the seizure of virtually anyone in the vicinity of such a delivery. <u>See</u> <u>United States v. Jackson</u>, No. 1:05-CR-67, 2006 WL 1474026, at *10 (N.D. Ind. May 25, 2006) ("For this court to uphold the police conduct in this case would be to ratify a situation that is 'likely to sweep many ordinary citizens into a generality of suspicious appearance. . . .'") (quoting <u>United States v. Rodriguez</u>, 976 F.2d 592, 595-96 (9th Cir. 1992) (concluding that the factors cited by the police in that case described "too many individuals to create a reasonable suspicion that this particular defendant was engaged in criminal activity")); <u>see also</u> <u>Reid v. Georgia</u>, 448 U.S. 438, 441 (1980) (holding that the facts necessary to justify a <u>Terry</u> stop cannot include "circumstances [which] describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure"). In any event, as discussed in the text, it is hard to see how anything defendant did during the minute or two Nagler watched him fit the profile. The government also argues that

12

the person for just a minute or two before approaching and seizing him. In this case, nothing prevented the police from continuing to watch defendant to see whether he approached the residence or otherwise attempted to retrieve the package.[8]

Nagler testified that defendant seemed surprised when he approached. But surprise would seem to be the normal reaction for an innocent person (as opposed to one conducting counter-surveillance) accosted by an armed police officer under these circumstances. In any event, courts have repeatedly cautioned against placing undue weight on a suspect's demeanor, as it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer, whether or not the person is currently engaged in criminal activity. E.g., United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998); see also United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999) ("Nervousness or refusal to make eye contact alone will not justify a Terry stop and pat-down[.]").

Finally, Nagler testified that defendant dropped his hands from the steering wheel. However, defendant made no further motions (such as reaching or leaning forward) consistent

_____

defendant may have created havoc at the scene, endangering the safety of the officers and others. But United States v. Jennings, 544 F.3d 815 (7th Cir. 2008), the only case cited in support, actually undercuts the government's argument. In that case, the defendant entered the "security perimeter" just as a SWAT team armed with high-powered rifles entered an apartment to conduct a narcotics search. "His arrival took the officers by surprise, and given the elevated risk of violence during a search for narcotics, they were reasonably concerned for their own and for Jennings's safety, as well as for any activity that might compromise the search. Had it become necessary for the officers to apprehend anyone trying to escape through the front door of the apartment, Jennings and his passenger would have been in their path." Id. at 818. The court found that under these circumstances it was reasonable for the officers to detain the defendant long enough to ensure that he was unarmed and uninvolved in criminal activity. Id. at 818-19. In the present case, conversely, defendant parked across the street and never approached the residence or otherwise acted in a manner that might have interfered with the law enforcement operation.

[8]It appears that an individual inside the residence accepted the package.

13

with the retrieval of a weapon, secreting of evidence, or fleeing the scene.[9]  Defendant's hand

movements must also be considered in context.  This is not a case where the police, before

approaching, had any specific reason to suspect defendant of violence or weapon possession;

indeed, they knew nothing about him at all.  The stop occurred in the middle of the day, in a

residential neighborhood, and the record contains no evidence that this was a so-called "high

crime" area.  Thus, while in some cases hand movements may support reasonable suspicion,

in the present case they do not, as the government presented no specific and articulable facts

suggesting that defendant's hand positioning presented a threat.  See, e.g., United States v.

Gorman, 66 Fed. Appx. 801, 803-04 (10th Cir. 2003) (holding that the defendant's placing of

his hands out of the officers' sight and near his waistband area did not provide grounds for a

Terry frisk, where the officers observed no bulge suggestive of a weapon, had no reasonable

belief that he was engaged in criminal activity, and had no reason to believe, other than the

movement to his waist, that he could have been armed and dangerous); United States v. Davis,

94 F.3d 1465, 1469 (10th Cir. 1996) (finding that the defendant's placement of his hands in his

coat pockets did not justify an investigative detention, where the government presented no

evidence indicating that the officers possessed any particularized basis for suspecting that he

was armed); Wright, 2012 WL 707085, at *6-7 (holding that a driver's "reluctance" to place his

hands on the steering wheel when ordered did not, under the circumstances, create reasonable

suspicion); see also United States v. Sawyers, 74 F. Supp. 2d 784, 789 (M.D. Tenn. 1999)

(stating that "furtive movements of the hands alone fail to justify a warrantless seizure and

---

[9]In its objections, the government argues that the mere act of lowering one's hands from
the steering wheel could portend the retrieval of a weapon (from the person's lap, for example).
However, as the magistrate judge carefully explained, defendant's movements did not suggest
such a threat.  (Recommendation at 3, 8-9.)

14

search").

The government has not shown that the facts and circumstances known to Detective Nagler at the time of the seizure, considered collectively, reasonably warranted the intrusion. The seizure therefore violated the Fourth Amendment.

**B.    Attenuation**

**1.    Applicable Legal Standards**

Statements and other evidence obtained pursuant to the defendant's consent following an illegal arrest must be excluded unless the government demonstrates sufficient attenuation to purge the primary taint.  See Brown v. Illinois, 422 U.S. 590, 602 (1975); United States v. Jerez, 108 F.3d 684, 694-95 (7th Cir. 1997); see also United States v. Cellitti, 387 F.3d 618, 622 (7th Cir. 2004) ("Consent given during an illegal detention is presumptively invalid."). Assuming that the defendant made the statement or provided the consent voluntarily, the court will consider (1) the temporal proximity of the illegal seizure and the statement/consent, (2) the presence of intervening circumstances between the two, and (3) the purpose and flagrancy of the official misconduct.  Brown, 422 U.S. at 603-04; Jerez, 108 F.3d at 695.  The government bears a "heavy burden" of demonstrating attenuation under these factors.  Jerez, 108 F.3d at 695.

There is no bright-line test for determining a sufficient lapse of time.  United States v. Conrad, 673 F.3d 728, 733 (7th Cir. 2012).  In some cases, a period as short as forty-five minutes may be sufficient to show attenuation; in others, six hours or more may not suffice. Id. (collecting cases).  More important than the simple passage of time is the "situational context."  See id. at 733-34; see also Ienco, 182 F.3d at 527 ("As this court has held, the

interval between the police misconduct and the acquisition of evidence is not itself dispositive and must be considered along with any intervening circumstances."). For instance, when "consent to search is given by a person who remains illegally detained, the government is unlikely to meet its burden of showing that the consent was sufficiently attenuated from the illegality." Cellitti, 387 F.3d at 623. Thus, in Cellitti, the court found six hours insufficient, despite the fact that the police treated the suspect well, because her "consent was given while she was still in custody because of the illegal arrest and there was no intervening event of significance." Id.; accord Taylor v. Alabama, 457 U.S. 687, 691 (1982) (finding six hours insufficient where the defendant remained in custody the entire time).

The provision of Miranda warnings, while relevant to voluntariness, will not alone suffice to purge the primary taint. Brown, 422 U.S. at 603-04; see also Kaupp v. Texas, 538 U.S. 626, 633 (2003). This is so because the question is not whether the statements should be excluded as involuntary under the Fifth Amendment (where Miranda warnings are relevant), but whether the statements should be excluded under the Fourth Amendment as the product of an illegal arrest. United States v. Reed, 349 F.3d 457, 464 (7th Cir. 2003). Nor will it suffice to note that the police conducted the questioning in a non-confrontational manner and gave the defendant time for solitary reflection. Id.; see also id. at 465 ("Without probable cause to believe that a crime has been committed, the police may not simply seize a person and hope that over time and after 'reflection' the person decides to cooperate."). Rather, the kinds of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence. Id. at 464; see also Ienco, 182 F.3d at 526 (stating that the "causal chain between the initial illegality and the evidence sought to be excluded" must be broken). Examples include delays of several days preceded by arraignment

16

and release from custody, <u>Reed</u>, 349 F.3d at 464 (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 491 (1963)); the discovery of other incriminating evidence implicating the defendant and causing the defendant to confess spontaneously, <u>id.</u> (citing <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 108-09 (1980)); the defendant freely agreeing to speak to the police at a site away from the scene of the illegal arrest and driving his own vehicle to the meeting, <u>id.</u> (citing <u>United States v. Fazio</u>, 914 F.2d 950, 958 (7th Cir. 1990)); the defendant's proper arrest on unrelated charges following the initial illegal arrest, <u>id.</u> (citing <u>United States v. Green</u>, 111 F.3d 515, 521 (7th Cir. 1997)); and the defendant's subsequent release from custody, appearance before a magistrate judge, discussions with counsel, or subsequent convictions on unrelated charges, <u>id.</u> (citing <u>United States v. Delgadillo-Velasquez</u>, 856 F.2d 1292, 1300 (9th Cir. 1988)); <u>see also</u> <u>United States v. Robeles-Ortega</u>, 348 F.3d 679, 683-84 (7th Cir. 2003) (collecting cases).

The final factor in the <u>Brown</u> analysis – the purpose and flagrancy of the official misconduct – is important because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct.  <u>Reed</u>, 349 F.3d at 464-65.  However, the court need not, in order to justify exclusion, find that the police exploited the illegal arrest or acted in bad faith.  <u>Id.</u> at 465.  This is so "because 'purposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner."  <u>Id.</u>  The requisite "quality of purposefulness" can be demonstrated when the arrest, in design and execution, is investigatory in nature.  <u>Id.</u>

### 2.    Analysis

The government fails to demonstrate sufficient attenuation regarding any of the post-

seizure evidence collected by the police in this case.[10]  As an initial matter, there can be no doubt that the evidence recovered from defendant's car and phone at the scene of the stop must be suppressed.  The police collected this evidence immediately after the seizure (between 12:50 and 1:10 p.m.), and no intervening events took place.  See Robeles-Ortega, 348 F.3d at 683 ("In this case, the court found that the consent was obtained within a few minutes of the illegal entry.  It is difficult to imagine a shorter time frame between the unconstitutional action and consent.  Therefore, as a matter of law this factor weighs against a determination that the causal connection was broken.").

Importantly, the police relied on the evidence gathered from defendant's cell phones and car at the scene to link him to the package and the 54th Street residence (as well as to the storage locker from which they later recovered a firearm and other evidence).  Although I need not determine the issue with precision in order to decide the motion, the record supports a finding that defendant was arrested (or had his freedom restrained to a degree comparable to a formal arrest) when he was handcuffed (at about 1:10 p.m.) and taken downtown for questioning regarding the package (at about 1:20 p.m.).  The arrest was based on defendant's on-the-scene statements and the evidence recovered pursuant to his consents immediately following the seizure.  The government makes no argument that evidence obtained from any other source supported the arrest, or that the police possessed any independent basis for arresting defendant. Under these circumstances, the arrest cannot "sever the causal connection" between the initial unlawful seizure and the subsequent discovery of evidence.

_____

[10]As the Seventh Circuit has suggested, I discuss the first two Brown factors (timing and intervening circumstances) together.

See Ienco, 182 F.3d at 528.[11]

After arriving downtown at about 2:10 p.m., officers placed defendant in an interview room and removed his handcuffs; he was then left alone for about eighteen minutes before officers entered the room and began questioning him. As in Reed, this brief period of "solitary down time" cannot suffice to break the connection to the unlawful arrest. 349 F.3d at 464. The officers provided Miranda warnings at about 2:32 p.m., which defendant waived at 2:34 p.m.; they briefed discussed the possibility of cooperation, and defendant started confessing at 2:43 p.m. Neither the provision of Miranda warnings, see id. (citing Taylor, 457 U.S. at 690; Brown, 422 U.S. at 605), nor defendant's decision to cooperate suffice to break the connection either, see id. at 466 ("That Reed determined it was in his best interest to cooperate does not somehow divorce his decision from the unlawful detention.").

At 3:00 p.m., the officers sought consent to search defendant's house, to which he agreed about ½ hour later; the officers sought consent to search the storage locker at 3:36 p.m., which defendant granted at 3:37 p.m.; he provided keys to facilitate the searches and at 3:40 p.m. admitted having a gun in the locker. These events occurred within two to three hours of the seizure, defendant remained in continuous police custody, and the government points to no intervening events of any significance during this time.

Over the next forty-five minutes or so, officers attempted to search defendant's house

---

[11]Further, the police were able to use this evidence to obtain defendant's confession and consents to search. Before he had even arrived downtown, the police had established a connection between defendant and the package mailing operation, and the storage locker. It is no surprise, then, that defendant promptly confessed and consented to searches. See United States v. Gillespie, 650 F.2d 127, 129 (7th Cir. 1981) (suppressing evidence obtained pursuant to consent where "all the officers' knowledge of [the defendant's] illegal activities was derived from their initial unconstitutional search").

and storage locker, returning to the interview room at 4:26 p.m. to ask which key opened the locker; a minute later they asked permission to pop the lock when they couldn't find the right key, which defendant granted. Officers again left defendant in the interrogation room at 4:34 p.m., and at 5:10 p.m. they found a gun, bullets, and money in the storage locker. Beyond the mere passage of time – during which defendant remained in continuous police custody – the government fails to explain how any of these events broke the connection between the unlawful seizure and the discovery of the evidence.

Defendant was left alone and fell asleep between 4:30 and 5:30 p.m., when the officers woke him and asked to open the package. Defendant asked to talk to his girlfriend, which the officers allowed him to do. The officers then repeated their request to open the package, to which defendant agreed. As indicated above, solitary down time does not suffice. See Reed, 349 F.3d at 464. Nor can I conclude that defendant's brief conversation with his girlfriend (during which he apparently asked about the child) broke the connection. This conversation cannot be compared to, for example, a discussion with counsel, which might have intervening significance.

Officers again left the room at 5:37 p.m., re-entering at 6:16 p.m., whereupon they further discussed defendant's cooperation with law enforcement. Between 6:50 and 6:52 p.m. they talked about the gun found in storage, and between 6:53 and 6:56 p.m. defendant revealed the location of the gun in his house. He offered to take the officers to his house, bring the speaker out, and let the officers grab it, which he apparently did some time after 7:11 p.m. Again, aside from the passage of time, nothing of intervening significance occurred during this period. Defendant remained in police custody the entire time (including when the officers drove him back to his house), and he turned over the last piece of evidence within about six hours

20

of his unlawful seizure.  The government contends that a substantial period of time elapsed, but the cases suggest that six hours will not suffice under these circumstances.  See Taylor, 457 U.S. at 691 (finding six hours insufficient where the defendant remained in custody the entire time); Cellitti, 387 F.3d at 623 (finding six hours insufficient where "consent was given while she was still in custody because of the illegal arrest and there was no intervening event of significance").

The government also notes that defendant was permitted to sleep, speak on the phone, and spend time alone.  However, even if these events could be considered significant, the record shows that defendant slept from about 4:30 to 5:30 p.m. and talked to his girlfriend at 5:34 p.m.; by that point, he had already confessed and provided consent to search his storage unit and residence.  The government cites no case holding that time spent alone in a police interrogation room constitutes an intervening event, and Reed supports the contrary conclusion.  The government notes that the officers told defendant early in the encounter that he would not be kept overnight.  However, he remained in continuous police custody during the relevant period; he was not permitted to leave the interrogation room or speak to anyone other than this girlfriend.  He was taken "downtown" by the police (and returned home by the officers); he did not drive his own vehicle from the scene of the seizure.

Finally, the government argues that Nagler's conduct was not flagrant or egregious; he was concerned for his own safety at the time he ordered defendant to put his hands up.  However, even conceding this point to the government, "the lack [of] such misconduct is of no moment because there was no intervening event to break the connection to the initial arrest." Ienco, 182 F.3d at 528.

21

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 23) is adopted, and defendant's motion to suppress (R. 9) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 7th day of August, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge